SEQUOYAH FEED & SUPPLY COMPANY, INC., v. ROBINSON.

4-9979                                          255 S. W. 2d 425

Opinion delivered February 23, 1953.

*Greenhaw & Greenhaw* and *Pearson & Pearson,* for appellant.

*Price Dickson, Rex W. Perkins, Jeff Duty* and *E. J. Ball,* for appellee.

ED. F. McFADDIN, Justice. This case stems from the financial dealings of J. A. Robinson and Pillsbury Mills, Inc.; and certain background facts must be recited for an understanding of the controversy. As hereinafter referred to:

(1) "Robinson" is J. A. Robinson, a resident of Northwest Arkansas;

(2) "Pillsbury" is Pillsbury Mills, Inc., a corporation engaged in the manufacture and sale of various kinds of grain products;

(3) "Sequoyah" is Sequoyah Feed & Supply Company, Inc., an Arkansas corporation, engaged in the retail sale of feed and grain products in Fayetteville, and other places in Northwest Arkansas;

(4) "Cotton" is Cotton Produce Company, a partnership composed of Robinson, Ashworth and Weir, doing business at Huntsville, Arkansas, and engaged in raising chickens for the commercial market; and

(5) "Bank" is the First National Bank, of Huntsville, Arkansas.

## Background Facts.

Beginning in March, 1945, Robinson acted as commission agent for Pillsbury in the sale of its products to dealers; and payments were due to Robinson from Pillsbury when, as, and if the dealers paid Pillsbury. Later Robinson organized Sequoyah, which acted as a dealer for Pillsbury products in several communities near Fayetteville. All of the stock in Sequoyah was owned or controlled by Robinson, who also organized "Cotton" as a partnership at Huntsville. This partnership owed the Bank a note for $7,000.

In June, 1950, an audit disclosed that Robinson was individually indebted to Pillsbury in excess of $93,000, and that Sequoyah was indebted to Pillsbury in excess of $84,000. Because of this indebtedness a contract (in two parts) was made on August 5, 1950, by the terms of which:

(a) Robinson transferred all of the outstanding certificates of stock of Sequoyah to three officials of Pillsbury;

(b) Robinson also transferred other assets to Pillsbury and to Sequoyah;

(c) Pillsbury released Robinson from the $93,000 personal indebtedness;

(d) Sequoyah became an endorser on the $7,000 note that Cotton owed to the Bank;[1] and

(e) Robinson continued as a broker of Pillsbury products on a commission basis and agreed that all commissions due him by Pillsbury, in excess of $700 per month, might be retained by Pillsbury and applied on any amount that Sequoyah should pay as endorser on the note of Cotton to the Bank, as aforesaid.

Cotton continued in business in Huntsville and became indebted to Sequoyah on open account in the sum of $5,062.24; also Robinson, while subsequently engaged in growing chickens in Fayetteville, became indebted to

---

[1] The security of the note was later strengthened by the Bank taking a mortgage on all of the chattel property of Cotton.

Sequoyah in the sum of $7,181.71, which was secured by a chattel mortgage. Then events began to happen in chronological order, as follows:

(1)   On February 5, 1951, Pillsbury terminated the commission agency contract with Robinson;

(2)   On April 21, 1951, Sequoyah notified the Bank (in accordance with § 34-333 *et seq.*, Ark. Stats.) that Sequoyah desired to be released from its endorsement of Cotton's $7,000 note to the Bank;

(3)   On April 23, 1951, Sequoyah filed suit against Robinson in the Washington Chancery Court seeking judgment for the said $7,181.71 and foreclosure of its mortgage. Sequoyah also had a writ of garnishment served on Pillsbury to cover any amounts that Pillsbury might owe Robinson, and this garnishment was later renewed;

(4)   On April 24, 1951, Sequoyah filed the present action in the Madison Circuit Court against Cotton seeking judgment for $5,062.24 due on open account; and Sequoyah had garnishment served on the Bank;

(5)   Because of § 34-333 *et seq.*, Ark. Stats., the Bank took charge of all of Cotton's chattel property covered by the mortgage. Then, on May 5, 1951, Cotton, Robinson, and Sequoyah stipulated that the Bank might sell all the said chattels and apply the proceeds on the $7,000 note, and that "the other parties hereto, to forthwith pay to said Bank the remaining sum due thereon." The Bank sold the chattels and Sequoyah then paid the Bank $4,902 balance due on the endorsement. Pillsbury then paid Sequoyah that amount out of the retained commission account of Robinson, under the terms of the said August, 1950, agreement. By February, 1952, additional amounts had become due to Robinson from Pillsbury in the sum of $4,433.87, but this was covered by the writ of garnishment issued by the Washington Chancery Court in the said case of Sequoyah v. Robinson.

## *This Lawsuit.*

As aforesaid, on April 24, 1951, Sequoyah filed this action in the Madison Circuit Court against Cotton to

recover judgment of $5,062.24 on the open account, and caused a writ of garnishment to be served on the Bank. Robinson and Ashworth[2] filed answer denying all the allegations of the complaint, and also filed cross-complaint against Sequoyah and Pillsbury for $25,000 damages for breach of contract as distinguished from tort. The basis of the damage claim against Pillsbury was that Pillsbury was all the time indebted to Robinson and withheld payment with the result that the entire business of Cotton had been taken by the Bank under its mortgage and sold for a grossly inadequate sum. The basis of the damage claim against Sequoyah was that Sequoyah had assumed and agreed to pay the $7,000 note of Cotton to the Bank, and that the failure of Sequoyah to make such payment had damaged Robinson and Ashworth. Sequoyah and Pillsbury filed separate denials to the cross-complaint and the case was tried to a jury in March, 1952.

At the conclusion of the trial, the Court:

(a) Directed a verdict for Sequoyah against Cotton for $5,062.24 due on open account; and the judgment rendered on that verdict is not questioned on this appeal;

(b) Directed a verdict for Robinson against Pillsbury for $4,433.87; and the judgment rendered on that verdict is one of the issues to be subsequently discussed; and

(c) Submitted to the jury the question of the damages claimed by Robinson and Ashworth; and the jury returned a verdict for them and against Sequoyah for $6,336; and the judgment rendered on that verdict is to be subsequently discussed.

I. *The Judgment for Robinson Against Pillsbury for $4,433.87.* This judgment was based on the *verdict directed by the Court;* and the correctness of such verdict and judgment is the point now at issue. In Robinson's and Ashworth's cross-complaint against Pillsbury, they sought $25,000 damages from Pillsbury because of its failure to pay—out of Robinson's retained commis-

---

[2] Weir did not file answer or cross-complaint.

sions—the $7,000 note that Cotton owed the Bank. There was no allegation or prayer in their cross-complaint that judgment be rendered for Robinson against Pillsbury for the balance of such commissions. The omission of such allegation and prayer was possibly because the pleaders knew that in the case of Sequoyah v. Robinson, filed in the Washington Chancery Court (and hereinafter referred to as the "Washington Chancery suit") one day prior to the present action, not only had a writ of garnishment been served on Pillsbury, but also Robinson had cross-complained against Pillsbury for damages. The fact of such suit and garnishment was shown in the evidence in the present case.

At all events, it was not until Robinson had completed his testimony in the present case that he asked to be allowed to amend the pleadings to conform to the proof. This motion was granted by the Court over Pillsbury's objections; and thereupon, Pillsbury offered in evidence the entire file of pleadings from the Washington Chancery case. The Court refused to admit such introduction, and we hold such refusal was error.

If the Court had permitted such introduction,[3] the Court would have found that in the Washington Chancery case involving $7,181.71, not only had a writ of garnishment been served on Pillsbury, but furthermore Robinson had—in the Washington Chancery case—cross-complained against Pillsbury for damages.[4] This cross-

---

[3] The file is brought into the present record by Pillsbury's offer to prove.

[4] The cross-complaint of Robinson against Pillsbury in the Washington Chancery case contained this paragraph:

"This defendant further pleading states that the exact amount of commissions due to this defendant are unknown in view of the fact that he does not have access to the records of either Pillsbury Mills, Inc., or Sequoyah Feed & Supply Company, Inc., in connection with the amount of feeds and supplies and baby chicks shipped, but he alleges that said commissions are far in excess of the amount sued for by the plaintiff herein, and that by reason of the fraudulent scheme of Pillsbury Mills, Inc., to deprive this defendant of the full benefits of his contract entered into with Pillsbury Mills, Inc., that he has been damaged in the sum of $25,000, for which amount he is entitled to judgment, and that in addition thereto he is entitled to have the claims of Sequoyah Feed & Supply Company, Inc., against him extinguished, cancelled, and held for naught, and all funds impounded under writs of garnishment in this cause released to him."

complaint against Pillsbury had been filed by Robinson in the Washington Chancery Court on October 12, 1951, and Pillsbury had joined issue[5] by answer filed on February 22, 1952, which was prior to the motion to amend the pleadings in the case at bar, as such motion was made at the trial which began on March 10, 1952. If the record had been allowed to be introduced in evidence, then Pillsbury would have had before the Court facts on which to base a plea of abatement because of prior suit pending. See *Dunbar* v. *Bourland,* 88 Ark. 153, 114 S. W. 467; *Wilson* v. *Sanders,* 217 Ark. 326, 230 S. W. 2d 19; and other cases collected in West's Arkansas Digest "Abatement & Revival," Key No. § 8 *et seq.*

But there was further error by the Trial Court in directing a verdict for Robinson against Pillsbury when the evidence had already been disclosed that the Washington Chancery case (filed by Sequoyah against Robinson) was filed prior to the present case, and involved in excess of $7,100, and that Pillsbury as garnishee only held $4,433.87 belonging to Robinson. When a garnishment has already been obtained in one jurisdiction and the defendant in that action later sues the garnishee in another jurisdiction, then in the absence of a governing statute, there are three lines of holdings as to what should be the course of procedure in the second action: (1) some courts hold that the proceedings in the second action may be abated until the termination of the garnishment proceedings; (2) other courts hold that trial of the second action should be continued to await the termination of the garnishment proceedings; (3) and other courts, while proceeding to judgment in the second action, suspend execution until the termination of the garnishment proceedings.[6]

A study convinces us that the better reasoned cases support the second holding. Applied to the case at bar,

[5] In the Washington suit, Pillsbury filed petition and bond for removal to the Federal Court, but Robinson's motion to remand to the Chancery Court was duly granted.

[6] The diversity of holdings is discussed in 5 Am. Jur. 32. See, also, 38 C. J. S. 423. As affecting suits in separate States, see the Annotation in 91 A. L. R. 959. See also Annotation in 166 A. L. R. 272.

this means that the cross-complaint of Robinson against Pillsbury for $4,433.87 should have been continued until the termination of the garnishment proceedings in the Washington Chancery Court.[7] Robinson filed no pleading in the Madison Circuit Court seeking the $4,433.87 judgment. He waited until the evidence was completed and then asked that the pleadings be amended to conform to the proof. In view of the state of the record we hold that the Madison Circuit Court should have continued the claim of Robinson v. Pillsbury for the $4,-433.87 until the garnishment proceedings had been concluded in the Washington Chancery Court. That Court first acquired jurisdiction. There were several interveners in the Madison Circuit Court case, and at the beginning of the present trial on March 10, 1952, the Court specifically reserved certain phases of the issues involving the interveners for later developments. The Robinson v. Pillsbury item of $4,433.87 should likewise have been so reserved.

Therefore, we reverse the judgment. in favor of Robinson and against Pillsbury for $4,433.87 and remand that angle of the controversy to the Madison Circuit Court with directions that an order of continuance be entered to await the final outcome of the garnishment proceedings in the Washington Chancery Court.[8]

II. *The Judgment Against Sequoyah for $6,336.00.* The Circuit Court submitted to the jury the questions: (a) whether Sequoyah and/or Pillsbury had unlawfully damaged Robinson and Ashworth by refusing to pay the said $7,000 note due by Cotton to the Bank; and (b) if so, then how much damages should Robinson and Ashworth recover from either Sequoyah or Pillsbury? Under such instruction, the jury returned a verdict for Robin-

[7] The record of the Washington Chancery case does not disclose that Robinson superseded the garnishment in that case by executing bond under § 31-515 Ark. Stats. Whether the execution of such a bond would have allowed Robinson to proceed against Pillsbury in this Madison Circuit Court case, is a question we do not decide.

[8] In our own case of St. L. I. M. Ry. v. *Richter*, 48 Ark. 349, 3 S. W. 56, the garnishment issued in another case was *after* the initiation of the principal suit. Yet even in that situation, we stayed execution awaiting the outcome of the garnishment case.

son and Ashworth against Sequoyah *alone* for $6,336; and Sequoyah challenges such verdict and judgment.

We hold that the Trial Court was in error in submitting to the jury any question about Sequoyah being liable in damages, because the uncontradicted proof negatives such a question. In Robinson's contract of August 5, 1920, Sequoyah became merely an endorser[9] on Cotton's note to the Bank. As an endorser, Sequoyah had the right to notify the Bank (as it did under § 34-333 *et seq.,* Ark. Stats.) that Sequoyah desired to be released from the said endorsement. Even if Pillsbury had retained money from Robinson's commissions to protect Sequoyah, still Sequoyah had a right to obtain a release from the endorsement. Sequoyah and Pillsbury were and are separate corporations; and the Court did not proceed on the theory of "piercing the fiction of the corporate entity," because the Court declared the law to the Jury: ". . . You are instructed that Sequoyah Feed & Supply Company is a corporation, and that Pillsbury Mills, Inc., is a corporation, and that each is a separate and distinct entity and person from the other."

Furthermore, after the Bank seized the mortgaged chattel property of Cotton in order to sell the same and determine the balance of Sequoyah's endorsement liability, Robinson, Ashworth and Cotton signed a stipulation with Sequoyah, dated May 15, 1951, reading in part:

"WHEREAS, The First National Bank of Huntsville, Arkansas, is the owner and holder of a certain promissory note executed by Cotton's Produce and en-

---

[9] The contract provided:

"Sequoyah will assume the liability of Huntsville as endorser on a $7,000 note payable 6 months from date, which is the primary obligation of Cotton Produce Company, a partnership composed of Robinson, Tommy Weir, and 'Cotton' Ashworth. Robinson agrees that to the extent of any amount paid by Sequoyah on that obligation, all commissions due or to become due to him from Pillsbury may be applied on the liability of Cotton Produce Company to repay Sequoyah the amount so paid. Robinson further agrees that any commissions earned by him and payable on or after the date of this agreement, and before maturity of the note, in excess of $700 per month may be retained by Pillsbury until the note is paid or until Sequoyah is released from all liability thereon, as security for the obligation of Cotton Produce Company to repay Sequoyah any amount paid by Sequoyah on the note, and applied as payment of such obligation if and when payment is made by Sequoyah."

dorsed by Huntsville Hatchery & Feed Co.,[10] Sequoyah Feed & Supply Co., all of said indorsers being liable to said bank for the payment thereof, said note bearing date of Jan. 17, 1951, and for the principal sum of $7,000, . . .; and Whereas, the payment of said note is secured by a certain chattel mortgage bearing the same date as said note, and default in the payment of said note has been made, and all parties hereto and below signed in person or by their duly authorized agents being desirous of avoiding unnecessary expenses in said matter, . . .

"Said Bank will cause to be advertised a sale of all of said mortgage property . . . that out of the proceeds of such sale said bank shall deduct all actual and necessary expenses and costs of such procedure and sale and apply the balance on and to the payment of said note, or credit such sum thereon, the other parties hereto to forthwith pay to said bank the remaining sum due thereon."

This stipulation admitted (a) that Sequoyah was an *endorser* of Cotton's note, (b) that the mortgaged chattels could be sold, (c) that the proceeds could be applied on the note, and (d) that the determined balance would then be paid. This stipulation—and its execution was freely admitted by all parties—constituted a complete waiver of any potential damage claim against Sequoyah, as later asserted by Robinson and Ashworth. In view of this stipulation, the Trial Court, instead of submitting to the Jury the damage claim of Robinson and Ashworth against Sequoyah, should have instructed a verdict in favor of Sequoyah for such damage claim. Such an instructed verdict was requested by Sequoyah. Therefore the damage judgment against Sequoyah is reversed, and on remand, the Trial Court will set aside such judgment.

### Conclusion

The Trial Court ordered that certain funds that had been garnished in the hands of the Bank, would be held until further orders. There were several interventions in the case which, as previously mentioned, were left for

---

[10] Huntsville Hatchery & Feed Co. was a trade name of Sequoyah.

further consideration. As between Sequoyah and Cotton, the garnishment of the Bank was good; but we forego any discussion of the garnishment because there may be some rights of the interveners yet to be adjudicated.